## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **AMBER LAVIGNE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **2:23-cv-00158-JDL** |
| | ) | |
| **GREAT SALT BAY COMMUNITY** | ) | |
| **SCHOOL BOARD,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER ON MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Plaintiff Amber Lavigne brings this action against Defendant Great Salt Bay Community School Board.[1]  Lavigne's claims center on events that occurred in late 2022 and early 2023 concerning her child, A.B., who was a student at Great Salt Bay Community School in Damariscotta from September 2019 until December 8, 2022. Lavigne's Complaint (ECF No. 1) asserts four constitutional violations: three based on substantive due process rights (Counts I, II, and III) and the fourth based on procedural due process rights (Count IV).  The School Board moves to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim (ECF No. 12).  A hearing was held on the motion on November 1, 2023, and the parties subsequently submitted additional case citations for the Court to consider (ECF Nos. 24, 25).  For reasons I will explain, I grant the School Board's motion and order the Complaint dismissed.

---

[1]  The Complaint also named as Defendants four individuals associated with the School and the Central Lincoln County School System.  The individual defendants have been dismissed from the case (ECF No. 23).

## I.  BACKGROUND

**A.      Factual Allegations**

I treat the following facts derived from the Complaint and its attachments as true for the purpose of evaluating the School Board's motion to dismiss.  *See Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 44 (1st Cir. 2012) ("[W]e accept the truth of all well-pleaded facts and draw all reasonable inferences therefrom in the pleader's favor.").

Amber Lavigne ("Lavigne") lives in Newcastle, Maine, and is the mother of three children, one of whom, A.B., was a thirteen-year-old student at Great Salt Bay Community School ("School") at the time of the relevant events.  Defendant Great Salt Bay Community School Board ("School Board") is the governing body for the School, which serves children from three Maine communities: Newcastle, Damariscotta, and Bremen.

In early December 2022, Lavigne came across a chest binder—"a device used to flatten a female's chest so as to appear male"—in A.B.'s bedroom.  ECF No. 1 at 5, ¶ 20.  A.B. told Lavigne that a social worker at the School had both provided A.B. with the chest binder and explained how to use it.  Lavigne "is informed and believes, and on that basis alleges," that the social worker simultaneously gave A.B. a second chest binder, explained that he would not tell A.B.'s parents about the chest binders, and said that "A.B. need not do so either."  ECF No. 1 at 6, ¶¶ 22-23.  The School had not informed Lavigne about the chest binders before she found one in A.B.'s bedroom.

Around the same time, Lavigne learned that A.B. had previously adopted and was using a different name and different pronouns at school.  At A.B.'s request, two social workers used A.B.'s self-identified name and pronouns when addressing A.B.

at school; other school officials followed suit.  The School had not informed Lavigne about A.B.'s request or the actions of the school staff in response.

Lavigne met with the School's principal and the Central Lincoln County School System's superintendent on or around December 5, 2022.  They expressed sympathy and concern that information about A.B. had been withheld and concealed from Lavigne.  Two days later, however, the superintendent met with Lavigne and told her that no policy had been violated by giving the chest binders to A.B., or by school officials using A.B.'s self-identified name and pronouns, without first informing Lavigne.  Lavigne withdrew A.B. from the School on December 8, 2022, and began homeschooling A.B.

On December 12, 2022, agents from the Maine Office of Child and Family Services visited or met with Lavigne in response to an anonymous report that Lavigne was emotionally abusive toward A.B.   The agency conducted an investigation, which it closed on January 13, 2023, having concluded "that the information obtained by the investigation did not support a finding of neglect or abuse."  ECF No. 1 at 8, ¶ 36; *see* ECF No. 1-2 at 1.

At the School Board's meeting on December 14, 2022, Lavigne spoke publicly about what had happened regarding A.B., describing "the trust that had been broken by Defendants withholding and concealing vitally important information from her respecting her minor child's psychosexual development."  ECF No. 1 at 9, ¶ 38.  The School Board and its members did not respond to Lavigne's comments at the meeting.

Thereafter, the School Board and the School's principal issued a total of three written public statements relevant to Lavigne's claims.[2] First, on December 19, 2022, the School Board Chair issued a written statement addressing, among other things, "recent concerns that have been brought to the attention of the administration and Board," and stating that the School Board's policies comply with Maine law, "which protects the right of all students and staff, regardless of gender/gender identity, to have equal access to education, the supports and services available in our public schools, and the student's right to privacy regardless of age."  ECF No. 1-3 at 1.

Second, several weeks later on January 14, 2023, the School Board issued a written statement responding to bomb threats and recent controversy affecting the School.  The statement addressed "another bomb threat on Friday[,] January 13"; referred to a "false narrative" that had been spread by "certain parties" that had "given rise to the bomb threats"; and affirmed that "[a]ll of the Board's policies comply with Maine law, and neither the Board nor school administration are aware of any violation of policy or law which requires further action at this time."  ECF No. 1-4 at 1.

Finally, on February 26, 2023, the School's principal issued a written statement addressing questions related to school safety.  In it she noted that there had been a "misunderstanding of [federal and state] laws pertaining to gender identity and privileged communication between school social workers and minor

---

[2] The statements are attached as exhibits to the Complaint (ECF Nos. 1-3, 1-4, 1-5).  *See Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008) ("Exhibits attached to the complaint are properly considered part of the pleading 'for all purposes,' including Rule 12(b)(6)." (quoting Fed. R. Civ. P. 10(c))).

clients [resulting] in the school and staff members becoming targets for hate speech and on-going threats." ECF No. 1-5 at 1. The letter noted further that state law protects school social workers from being required to share certain "information gathered during a counseling relation with a client or with the parent, guardian or a person or agency having legal custody of a minor client." ECF No. 1-5 at 1 (quoting 20-A M.R.S.A. § 4008(2) (West 2024)).

**B.    Lavigne's Legal Claims**

Lavigne asserts that the School Board and school officials violated her fundamental right as a parent "to control and direct the care, custody, education, upbringing, and healthcare decisions, etc., of [her] children" by providing A.B. with chest binders and using A.B.'s self-identified name and pronouns without prior notice or providing a process through which Lavigne could "express her opinion respecting these practices." ECF No. 1 at 1-2, ¶¶ 2-3. The Complaint contends that the School Board withheld and concealed information from Lavigne regarding the chest binders and A.B.'s use of a different name and pronouns "pursuant to a blanket policy, pattern, and practice of withholding and concealing information respecting 'gender-affirming' treatment of minor children from parents." ECF No. 1 at 7, ¶ 29. The Complaint also asserts that the School Board's actions deprived Lavigne of the opportunity to meaningfully make decisions about A.B.'s care, upbringing, and education.

The Complaint's four counts all assert violations of Lavigne's constitutional rights, actionable under 42 U.S.C.A. § 1983 (West 2024). Three counts allege the School Board and school officials committed substantive due process violations under

the Fourteenth Amendment to the United States Constitution by (1) providing chest binders to A.B. and instructing A.B. on their use without first informing Lavigne (Count I); (2) using A.B.'s self-identified name and pronouns and withholding that information from Lavigne (Count II); and (3) adopting Transgender Students Guidelines that enable staff members to withhold information from parents (Count III). For the fourth count, Lavigne alleges that she was deprived of procedural due process in violation of the Fourteenth Amendment because she was not afforded an opportunity to comment on school officials' decisions to give A.B. chest binders or to use A.B.'s self-identified name and pronouns at school (Count IV).

In her Opposition to the Motion to Dismiss (ECF No. 16), however, Lavigne makes it clear that all counts in her Complaint center on her "right not to have information about decisions actively withheld by Defendants pursuant to the Withholding Policy." *See* ECF No. 16 at 8 (discussing procedural due process claim); ECF No. 16 at 10 (arguing in context of substantive due process claims that "Defendants violated Plaintiff's rights by withholding and even concealing" information from Lavigne). Lavigne's opposition clarifies further that the "Withholding Policy" underlying her claims, though "unwritten," is established by the Defendants' "policy, practice, and custom." ECF No. 16 at 3. Although the Complaint never uses the phrase "Withholding Policy,"[3] it conveys a similar theory, seeking "[a] declaratory judgment by the Court that Great Salt Bay Community School's policy, pattern, and practice of withholding or concealing from parents, information about

---

[3] The phrase "Withholding Policy" appears for the first time in Lavigne's Opposition to the Motion to Dismiss. *See* ECF No. 16 at 3.

the[ir] child's psychosexual development, including their asserted gender identity, absent some specific showing of risk to the child, violates the Due Process Clause of the Fourteenth Amendment." ECF No. 1 at 20, ¶ A. Lavigne also seeks an injunction, nominal and actual damages, and attorney's fees and costs.

## II. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter to state a claim to relief that is plausible on its face."[4] *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013) (quoting *Grajales*, 682 F.3d at 44). Courts use a two-step approach to evaluate whether a complaint meets that standard. "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).' Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (citation omitted) (first quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012); and then quoting *Haley v. City of Bos.*, 657 F.3d 39, 46 (1st Cir. 2011)). A complaint is subject to dismissal if its factual

---

[4] The School Board's motion is properly evaluated as a Rule 12(b) motion to dismiss, and not a Rule 12(c) motion for judgment on the pleadings, even though the School Board filed its motion to dismiss and Answer (ECF No. 13) on the same day. A post-answer motion to dismiss should be treated as a motion for judgment on the pleadings, *see Patrick v. Rivera-Lopez*, 708 F.3d 15, 18 (1st Cir. 2013), but the School Board here filed the motion to dismiss slightly before the answer. Even if the motion to dismiss is treated as having been filed "simultaneously with the answer, the district court will view the motion as having preceded the answer and thus as having been interposed in timely fashion." 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1361 (3d ed.). In any event, the First Circuit has noted that "[c]onverting the grounds for a motion from Rule 12(b)(6) to Rule 12(c) 'does not affect our analysis inasmuch as the two motions are ordinarily accorded much the same treatment.'" *Rivera-Lopez*, 708 F.3d at 18 (quoting *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 54 (1st Cir. 2006)).

allegations "are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture." *S.E.C. v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010).

To establish that a municipality is liable under section 1983 for a deprivation of constitutional rights, a plaintiff must show both "that [the] plaintiff's harm was caused by a constitutional violation," and "that the [municipality is] responsible for that violation, an element which has its own components." *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 25-26 (1st Cir. 2005). I first consider the second issue: whether the Complaint adequately pleads facts that could plausibly support municipal liability under section 1983. Concluding that it does not, I need not, and therefore do not, address the separate question of whether any of the alleged constitutional violations are adequately pleaded.

## III. ANALYSIS

### A. Municipal Liability for Alleged Constitutional Violations Under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978)

Section 1983 permits a lawsuit against a person who, while acting under color of law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C.A. § 1983. The Supreme Court held in *Monell v. Department of Social Services of the City of New York* that municipalities can be proper defendants under section 1983. 436 U.S. 658, 690 (1978) ("Congress *did* intend municipalities and other local government units to be included among those persons to whom [section] 1983 applies."). Section 1983 municipal

liability principles apply to school boards and public education units in Maine, including a community school district such as the Great Salt Bay Community School District. *See, e.g.*, *Doe v. Reg'l Sch. Unit No. 21*, No. 2:19-[cv]-00341-NT, 2020 WL 2820197 (D. Me. May 29, 2020) (applying municipal liability concepts to RSU 21); *Raymond v. Maine Sch. Admin. Dist. 6*, No. 2:18-cv-00379-JAW, 2019 WL 2110498 (D. Me. May 14, 2019) (applying municipal liability concepts to MSAD 6).

Although section 1983 claims can be brought against municipalities, a local government entity such as, in this instance, the Great Salt Bay Community School Board, may be held liable "only where that [entity]'s policy or custom is responsible for causing the constitutional violation or injury." *Abdisamad v. City of Lewiston*, 960 F.3d 56, 60 (1st Cir. 2020) (quoting *Kelley v. LaForce*, 288 F.3d 1, 9 (1st Cir. 2002)); *see Monell*, 436 U.S. at 694. In other words, "a [section] 1983 action brought against a municipality pursuant to [*Monell*] is proper only where the plaintiff pleads sufficient facts to indicate the existence of an official municipal policy or custom condoning the alleged constitutional violation." *Ouellette v. Beaupre*, 977 F.3d 127, 140 (1st Cir. 2020). The "policy or custom" requirement applies even where a plaintiff seeks declaratory or injunctive relief, as Lavigne does in part here. *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 31 (2010). Municipal bodies cannot be held liable under section 1983 for the acts of their employees on a *respondeat superior* theory. *Monell*, 436 U.S. at 691. Rather, "a plaintiff who brings a section 1983 action against a municipality bears the burden of showing that, 'through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged.'" *Haley*, 657 F.3d at 51 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997)).

**B.      The Challenged "Policy or Custom"**

The purported municipal "policy or custom" that Lavigne challenges is somewhat nebulous.  The School's written "Transgender Students Guidelines" ("Guidelines") are attached as an exhibit to the Complaint (ECF No. 1-6).[5]  The stated purposes of the Guidelines are (1) "[t]o foster a learning environment that is safe, and free from discrimination, harassment and bullying; and [(2) t]o assist in the educational and social integration of transgender students in our school."  ECF No. 1-6 at 1.  The School Board emphasizes, and Lavigne does not dispute, that the Guidelines establish a procedure which calls for the participation of a transgender student's parent(s) or guardian(s).[6]  *See* ECF No. 1-6 at 2 ("A plan should be developed by the school, in consultation with the student, parent(s)/guardian(s) and others as appropriate, to address the student's particular needs.").  The Complaint does not allege that the School Board or school officials violated the Guidelines.

Lavigne expressly confirms in her Opposition to the Motion to Dismiss that "the Guidelines are not the policy Plaintiff challenges."[7]  ECF No. 16 at 8.  Instead,

---

[5]  Also attached as an exhibit to the Complaint is the Great Salt Bay Community School District's policy on "Staff Conduct with Students" (the "Conduct Policy").  ECF No. 1-7 at 1.  Part of the Conduct Policy's intent is to ensure that staff members and students have interactions "based upon mutual respect and trust."  ECF No. 1-7 at 1.  Examples of "expressly prohibited" conduct by staff members include: "[a]sking a student to keep a secret" and, for "non-guidance/counseling staff, encouraging students to confide their personal or family problems and/or relationships.  If a student initiates such discussions, staff members are expected to be supportive but to refer the student to appropriate guidance/counseling staff for assistance."  ECF No. 1-7 at 1.  The Complaint does not allege that the School Board or school officials violated the Conduct Policy.

[6]  The Guidelines also acknowledge the role of parent(s)/guardian(s) in connection with the disclosure of information from a students' records: "School staff should keep in mind that under FERPA, student records may only be accessed and disclosed to staff with a legitimate educational interest in the information.  Disclosures to others should only be made with appropriate authorization from the administration and/or parents/guardians."  ECF No. 1-6 at 3.

[7]  Lavigne's concession that she does not challenge the Guidelines appears to be at odds with several statements in the Complaint, an inconsistency which suggests that Lavigne's theory of the basis for municipal liability has shifted.  For example, the Complaint "seeks a declaration that the [Guidelines]

Lavigne asserts that her alleged injuries have been caused by an unwritten "Withholding Policy," which she describes as "a systematic across-the-board practice which is not specified, but is hinted at, in the written 'Guidelines.'"  ECF No. 16 at 8.  She contends that the Guidelines "are supplements to the Withholding Policy, and in fact, permit the policy and practice of withholding/concealment."  ECF No. 16 at 12 (emphasis omitted).  Lavigne does not otherwise address or explain how the Withholding Policy is hinted at in the Guidelines.

In her Opposition to the Motion to Dismiss, Lavigne argues that the School Board's unwritten Withholding Policy consists of "withholding and even concealing from parents information about actions the Defendants take with respect to children's mental and physical wellbeing—information crucial to a child's development, and which . . . any conscientious parent would desire to know."  ECF No. 16 at 1.  She asserts that the "Withholding Policy consists of a regular pattern, custom, and practice of withholding information from parents in situations where the Defendants believe a child may be transgender—without any consideration of specific circumstances, or whether such withholding/concealment is warranted by particular

---

are unconstitutional insofar as they provide for the concealment of, or do not mandate informing parents of, a decision to provide 'gender-affirming' care to a student."  ECF No. 1 at 4, ¶ 11.  Lavigne also alleges in the Complaint that (1) the "Defendants contend that their actions with respect to all allegations herein were mandated by school board policies—specifically the [Guidelines] and the [Conduct Policy]," ECF No. 1 at 11, ¶ 48, and (2) the "School Board will continue to violate parents' longstanding Fourteenth Amendment rights if it is not enjoined from continuing to enforce [the] Guidelines in the future," ECF No. 1 at 18, ¶ 88.  To the extent that the Complaint includes allegations about the Guidelines that are contradicted by the attached exhibit, it is proper to rely on the text of the attachment.  *Yacubian v. United States*, 750 F.3d 100, 108 (1st Cir. 2014) ("[I]t is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." (quoting *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 229 n.1 (1st Cir. 2013))).  In any event, Lavigne concedes that "the Guidelines are not the policy [she] challenges."  ECF No. 16 at 8.  Thus, I do not consider the written policy as a possible basis for municipal liability.

facts about a child or parent." ECF No. 16 at 8-9. The Withholding Policy, she contends, "consists of actively keeping information from parents—and even encouraging children to conceal information—about affirmative steps the school is taking with respect to a child's psychosexual development." ECF No. 16 at 7. Lavigne argues that the Withholding Policy, although unwritten, constitutes "a general rule governing all cases" and "an across-the-board practice of always withholding information of this sort from parents." ECF No. 16 at 10-11. The School Board disagrees, arguing that Lavigne cannot point to any written policy to substantiate her claims, and that the Complaint—although it alludes in a conclusory fashion to an unwritten policy of concealing information—fails to adequately plead that such a policy actually exists.

The Complaint repeatedly alleges that the School has a "policy, pattern, and practice" of intentionally withholding and concealing certain information from parents. *See, e.g.*, ECF No. 1 at 2, 6-7, ¶¶ 4, 21, 27, 29. But I do not credit these conclusory statements as adequately pleading that such a "policy or custom" exists. *See Manning v. Bos. Med. Ctr. Corp.*, 725 F.3d 34, 43 (1st Cir. 2013) ("[C]onclusory allegations that merely parrot the relevant legal standard are disregarded, as they are not entitled to the presumption of truth."); *see also Massó-Torrellas v. Municipality of Toa Alta*, 845 F.3d 461, 469 (1st Cir. 2017) (affirming dismissal of a section 1983 claim despite complaint's assertion that the "[m]unicipality implemented 'customs and policies' which caused the plaintiffs' injuries"). Instead, I read the Complaint as a whole, attachments included, and consider whether Lavigne has alleged sufficient non-conclusory facts to support a reasonable inference that the

12

municipality is liable for the conduct that Lavigne challenges.  *See García-Catalán*, 734 F.3d at 103.

## C.   Applying Theories of Municipal Liability to Assess the Sufficiency of Lavigne's Complaint

Lavigne's Complaint implicates three possible theories of municipal liability: (1) unwritten policy or custom; (2) ratification by a final policymaker; and (3) failure to train.  I consider each theory in turn.

### 1.   Municipal Liability Based on Unwritten Policy or Custom

Unwritten policies can give rise to municipal liability only where those policies are "so permanent and well settled as to constitute a custom or usage with the force of law."  *Abdisamad*, 960 F.3d at 60 (internal quotation marks omitted) (quoting *Monell*, 436 U.S. at 691).  "Put another way, a municipality can be held liable if an unlawful 'custom or practice' is 'so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.'"  *Baez v. Town of Brookline*, 44 F.4th 79, 82 (internal quotation marks omitted) (quoting *Whitfield v. Meléndez-Rivera*, 431 F.3d 1, 13 (1st Cir. 2005)).

Here the Complaint, read as a whole and viewed in the light most favorable to the Plaintiff, does not plausibly establish that the alleged Withholding Policy is a settled custom or practice of the School or the School Board.  Paragraphs 20-28 of the Complaint[8] set out the central facts concerning (1) Lavigne's discovery of the chest

---

[8] Paragraphs 20-28 state:

> 20. On December 2, 2022, Plaintiff was assisting A.B. in cleaning A.B.'s room at home when she discovered a chest binder—a device used to flatten a female's chest so as to appear male.  Upon inquiry, A.B. explained that [a social worker] gave it to A.B. at

binders and that the chest binders were provided to A.B. by a social worker who "told

A.B. that he was not going to tell A.B.'[s] parents about the chest binder[s], and A.B.

need not do so either"; and (2) "that school officials had been calling A.B. by a name

not on [A.B.'s] birth certificate and were referring to A.B. with gender-pronouns not

---

Great Salt Bay Community School and instructed A.B. on how to use it. *See* photos attached as Exhibit 1.

21. Plaintiff had never been informed before that A.B. had been given a chest binder at the school or instructed about its use. Plaintiff is informed and believes, and on that basis alleges, that this was the result of the Great Salt Bay School's blanket policy, pattern, and practice of intentional withholding and concealment of such information from all parents.

22. Plaintiff is informed and believes, and on that basis alleges, that [the social worker] gave A.B. the chest binder in his office and told A.B. that he was not going to tell A.B.'[s] parents about the chest binder, and A.B. need not do so either.

23. Plaintiff is informed and believes, and on that basis alleges, that [the social worker] gave A.B. a second chest binder at the same time. *See* Exhibit 1.

24. Chest binders are not medical devices, but there are potential health risks associated with the wearing of such binders, including difficulty breathing, back pain, and numbness in the extremities.

25. Sexual identity, gender identification, and body image, particularly with respect to such sexual characteristics as the female breast, are vitally important and intimate psychological matters, central to an individual's personality and self-image, and a crucial element in how people relate to the world. The significance of such matters is even greater with respect to young people, particularly teenagers going through puberty. Consequently, any conscientious parent has a legitimate interest in knowing information respecting his or her child's sexual and psychological maturation, including but not limited to, the fact that the child is using a chest-binder, and/or is being identified by names or pronouns not associated with that child's birth sex.

26. After Plaintiff learned of the chest binder(s) on December 2, 2022, Plaintiff also discovered that school officials had been calling A.B. by a name not on [A.B.'s] birth certificate and were referring to A.B. with gender-pronouns not typically associated with A.B.'s biological sex. Plaintiff had never been informed of these facts.

27. Plaintiff is informed and believes, and on that basis alleges, that failure to inform Plaintiff regarding the school's use of certain pronouns when referring to A.B was the result of the Great Salt Bay School's blanket policy, pattern, and practice of intentional withholding and concealment of such information from all parents.

28. Specifically, Plaintiff is informed and believes, and on that basis alleges, that [two social workers] chose, at A.B[.]'s request, to use a different name and pronouns when speaking to or about A.B., and that other officials at the school, including some teachers, did so afterwards. At no time, however, did any Defendant or any other school official inform Plaintiff of these facts.

ECF No. 1 at 5-7, ¶¶ 20-28.

typically associated with A.B.'s biological sex."  ECF No. 1 at 6, ¶¶ 22, 26.  These allegations culminate with the following conclusion:

> Plaintiff is informed and believes, and on that basis alleges, that Defendants withheld and concealed this information from her pursuant to a blanket policy, pattern, and practice of withholding and concealing information respecting "gender-affirming" treatment of minor children from their parents.

ECF No. 1 at 7, ¶ 29.

Assertions in a complaint "nominally cast in factual terms but so general and conclusory as to amount merely to an assertion that unspecified facts exist to conform to the legal blueprint" are insufficient to state a cognizable claim.  *Menard v. CSX Transp., Inc.*, 698 F.3d 40, 45 (1st Cir. 2012).  Here, as I will explain, the Complaint's assertion that there is a "blanket policy, pattern, and practice of withholding and concealing information respecting 'gender-affirming' treatment of minor children from their parents," ECF No. 1 at 7, ¶ 29, states a conclusion unsupported by factual allegations that would plausibly establish the existence of a permanent and well-settled custom.

At most, the Complaint identifies one occasion where a School employee "actively withheld" information from a parent, ECF No. 16 at 8: when the social worker "told A.B. that he was not going to tell A.B.'[s] parents about the chest binder, and A.B. need not do so either," ECF No. 1 at 6, ¶ 22.  The Complaint also alleges that school officials failed to alert Lavigne that some staff members had been using a different name and different pronouns at A.B.'s request.  Despite those allegations, there is no fact or set of facts alleged in the Complaint which support a reasonable inference that the challenged conduct related to A.B. was in keeping with a custom

or practice of withholding information "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Baez*, 44 F.4th at 82 (quoting *Whitfield*, 431 F.3d at 13). Indeed, the Complaint alleges that the principal and superintendent "expressed sympathy . . . and concern that this information had been withheld and concealed from [Lavigne]," ECF No. 1 at 8, ¶ 33, undercutting the conclusion, required to sustain Lavigne's claim under this theory, that withholding information from parents was a custom so widespread as to have the force of law.

The Complaint frequently references the School Board's "widespread custom" of making decisions without informing parents, including that "[t]he Great Salt Bay Community School Board's official policy and widespread custom of making decisions for students without informing or consulting with their parents established an environment in which giving A.B. a chest binder and instructing A.B. on how to use a chest binder—without consulting Plaintiff, and afterwards withholding or concealing this information from Plaintiff—was not only allowed but considered standard practice for [the social worker who gave A.B. the chest binders]." ECF No. 1 at 14, ¶ 65; *see also* ECF No. 1 at 15-17, ¶¶ 72, 73, 75, 76, 80, 81. But these conclusory statements are not supported by additional allegations that, if proven, would demonstrate the existence of a custom that could form a basis for municipal liability under *Monell*. Because the Complaint fails to allege facts that, if proven, would plausibly demonstrate that the challenged actions resulted from an unconstitutional unwritten custom, Lavigne's municipal liability claims cannot

proceed on that basis. *See Abdisamad*, 960 F.3d at 60 (concluding that the complaint's "factual allegations do not support a plausible inference that the City Defendants' actions resulted from an unconstitutional policy or custom").

### 2. Municipal Liability Based on Ratification by a Final Policymaker

Another means by which a plaintiff can satisfy *Monell*'s municipal "policy or custom" requirement is "by showing that 'a person with final policymaking authority' caused the alleged constitutional injury." *Fincher v. Town of Brookline*, 26 F.4th 479, 485 (1st Cir. 2022) (quoting *Rodríguez v. Municipality of San Juan*, 659 F.3d 168, 181 (1st Cir. 2011)). "[A] single decision by a final policymaker can result in municipal liability." *Welch v. Ciampa*, 542 F.3d 927, 942 (1st Cir. 2008). Whether a defendant is a municipal policymaker is a question of state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988); *Walden v. City of Providence*, 596 F.3d 38, 56 (1st Cir. 2010). One way to establish municipal liability is to show that a final municipal policymaker "approve[d] a subordinate's decision and the basis for it." *Praprotnik*, 485 U.S. at 127. "Although *Praprotnik* does not define what constitutes 'ratification,' it draws a line between passive and active approval." *Saunders v. Town of Hull*, 874 F.3d 324, 330 (1st Cir. 2017).

Lavigne argues that the School Board ratified the actions of the two social workers and the principal[9] through the School Board's January statement that

---

[9] I note that, although Lavigne argues that the School Board's January statement constituted a "*post hoc* ratification of the actions" of the principal, ECF No. 1 at 10, ¶ 43, the Complaint's only allegation about the principal's actions prior to the January statement is that she met with Lavigne on or around December 5, 2022, after Lavigne discovered the chest binder, and "expressed sympathy with Plaintiff, and concern that this information had been withheld and concealed from her," ECF No. 1 at 8, ¶ 33.

neither it "nor school administration are aware of any violation of policy or law which requires further action at this time." ECF No. 1 at 10, ¶ 42 (quoting ECF No. 1-4 at 1); *see* ECF No. 1 at 10, ¶ 43. In support of her ratification theory, Lavigne also points to the Complaint's assertion that "[the superintendent] in a subsequent meeting with Plaintiff explained that no policy had been violated by the giving of chest binders to A.B., or by school officials (specifically [the two social workers]) employing a different name and pronouns with respect to A.B., without informing Plaintiff."[10] ECF No. 1 at 8, ¶ 34. In response, the School Board argues that because "there is no allegation that the Great Salt Bay School Board had any knowledge of a policy violation," no ratification occurred. ECF No. 17 at 7.

The superintendent's alleged statement that no policy had been violated does not itself constitute an actionable policy from which municipal liability might flow because there are no facts pleaded in the Complaint which suggest that the superintendent possessed final policy-making authority for the municipality.[11] "A single decision by a municipal policymaker constitutes official policy 'only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'" *Freeman v. Town of Hudson*, 714 F.3d 29, 38 (1st Cir. 2013) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)); *see also Craig v.*

---

[10] Lavigne contends that ratification is also shown by the School Board's eventual approval of a second-year probationary contract for the social worker who provided the chest binders to A.B. That allegation is not contained in the Complaint; Lavigne explains that the approval occurred after the initiation of this action. Even if that fact was alleged in the Complaint, it would not—in isolation or taken together with the other facts alleged—support a reasonable inference that the School Board affirmatively endorsed the particular conduct that Lavigne challenges in a manner that would support municipal liability.

[11] Indeed, the Complaint describes the superintendent's role as ensuring that the School complies with School Board policies and state laws.

*Maine Sch. Admin. Dist. No. 5*, 350 F.Supp.2d 294, 297-98 & n.2 (D. Me. 2004) (granting motion to dismiss where complaint failed to plausibly allege that superintendent "had policymaking authority" or that the municipal entity "specifically delegated its policymaking functions to" the superintendent); *Praprotnik*, 485 U.S. at 126 ("If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability.").   Further, the School Board's written statement that neither it nor school administrators were aware of a violation of policy or law— without identifying any particular decision or decisions of a subordinate—does not, without more, plausibly show that the School Board "active[ly] approv[ed]," *Saunders*, 874 F.3d at 330, of "a subordinate's decision and the basis for it" such that municipal liability could follow, *Praprotnik*, 485 U.S. at 127.   The single alleged incident of a School staff member "actively with[olding]" information, together with the School Board's vague expression more than one month later[12] that it was not aware of any violation of law or policy, do not, either separately or in combination with other facts alleged in the Complaint, establish a de facto municipal policy from which *Monell* liability may arise.

### 3.   Municipal Liability Based on Failure to Train

Lavigne finally argues that even if the School Board does not have a Withholding Policy, its failure to train the School's employees that the withholding of important information—such as a student's use of chest binders and adoption of a

---

[12]  The School Board also issued the statement a full month after Lavigne spoke at the School Board meeting, and after issuing a separate written statement soon after Lavigne addressed the School Board.

new name and gender pronouns—from the student's parents represents a failure to train on which *Monell* liability may be based.

Under some limited circumstances, a municipality may be liable under section 1983 for "constitutional violations resulting from its failure to train municipal employees." *City of Canton v. Harris*, 489 U.S. 378, 380 (1989). However, the municipality is liable only if its failure to train constitutes "deliberate indifference to the constitutional rights of its inhabitants." *Id.* at 392; *see also Haley*, 657 F.3d at 52 ("Triggering municipal liability on a claim of failure to train requires a showing that municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects of those inadequacies."). A plaintiff does not state a claim for municipal liability by pleading "mere insufficiency of a municipality's training program." *Marrero-Rodríguez v. Municipality of San Juan*, 677 F.3d 497, 503 (1st Cir. 2012).

"Deliberate indifference is a stringent standard of fault," and, to prevail on such a claim, a plaintiff must ultimately show "proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (alteration and internal quotation marks omitted) (quoting *Brown*, 520 U.S. at 410). "[A] training program must be quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing." *Young*, 404 F.3d at 27. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (quoting *Brown*, 520 U.S. at

409).  However, a plaintiff may not be required to establish a pattern if the need to train municipal officers on constitutional limitations is "so obvious" as to support a finding of deliberate indifference.  *Canton*, 489 U.S. at 390 & n.10.

Lavigne argues that the School Board did not properly train school officials "about parental rights in the gender identity context" after adopting the Transgender Students Guidelines, including in situations where a student requests to be called by a particular name or pronouns, or where staff members provide chest binders to students.  ECF No. 1 at 17, ¶ 79.  However, the Complaint does not assert any facts about the actual training that school officials did or did not receive.  The Complaint is devoid of alleged facts which could plausibly show a pattern of constitutional violations by untrained staff members, or that the need to train staff members on "parental rights in the gender identity context" was so obvious as to support a finding of deliberate indifference.  ECF No. 1 at 17, ¶ 79.  Lavigne's conclusory assertions to the contrary are not sufficient to plead deliberate indifference and, therefore, her claims do not withstand the School Board's motion to dismiss.

## D.    Conclusion Regarding Municipal Liability

It is understandable that a parent, such as Lavigne, might expect school officials to keep her informed about how her child is navigating matters related to gender identity at school.  Her Complaint, however, fails to plead facts which would, if proven, establish municipal liability under *Monell* and its progeny based on an unwritten custom, ratification by a final policymaker, or failure to train.  The School Board's Motion to Dismiss is, therefore, granted as to all counts, and I do not separately address the School Board's additional arguments that the Complaint fails

21

to plead facts from which any violation of Lavigne's substantive or procedural due process rights could be found.[13]

## IV. CONCLUSION

It is accordingly **ORDERED** that the Motion to Dismiss for Failure to State a Claim (ECF No. 12) is **GRANTED** and the Complaint (ECF No. 1) is **DISMISSED**.

**SO ORDERED.**

**Dated: May 3, 2024**

_/s/_ JON D. LEVY
**U.S. DISTRICT JUDGE**

---

[13]   My conclusion as to municipal liability applies to all four counts, which encompass both substantive due process and procedural due process claims premised on the same purported "Withholding Policy." *See, e.g., Abdisamad*, 960 F.3d at 60-61 (applying municipal liability concepts to conclude that plaintiff's substantive due process claim against city was properly dismissed); *Bernard v. Town of Lebanon*, No. 2:16-cv-00042-JAW, 2017 WL 1232406, at *6 (D. Me. Apr. 3, 2017) (citing municipal liability concepts as one basis for concluding that plaintiff had failed to state a claim against town for violation of procedural due process rights); *accord Oden, LLC v. City of Rome*, 707 F. App'x 584, 586 (11th Cir. 2017) ("Procedural due process claims brought under [section] 1983 are subject to limitations on municipal liability.").